UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY GILLIAM,

    Plaintiff,

v.

DR. MARCELLA CLARK,

    Defendant.
                                      /

Case No. 03-72302

Honorable Nancy G. Edmunds

**ORDER GRANTING DEFENDANT MARCELLA CLARK'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S SOLE REMAINING CLAIMS AGAINST HER IN PARAGRAPHS 39(d) AND 39(e) OF PLAINTIFF'S COMPLAINT**

      This matter came before the Court on the Magistrate Judge's November 22, 2004 Report and Recommendation recommending a grant of Defendants' motion for summary judgment and dismissal of all claims in Plaintiff's complaint except those in paragraphs 39(d) and 39(e) alleging Defendant Clark's deliberate indifference to Plaintiff's serious medical needs by refusing to follow another doctor's plan of treatment or to fill prescriptions for pain and other medications.  The Magistrate Judge observed that, although Defendant responded that the treatment plan was followed and prescription pain medication was provided, Defendant failed to attach exhibits referenced in Defendant's response. (R. & R. at 26.)  Defendant filed objections to the Report and Recommendation that similarly referenced documents that were either not attached or were inappropriately referenced.

      This Court accepted and adopted the Magistrate Judge's November 22, 2004 Report and Recommendation, and ordered Defendant Clark is to file a supplemental motion and

1

substantive brief for summary judgment on the remaining claims under paragraphs 39(d) and 39(e) of Plaintiff's complaint and ordered Plaintiff to file a response.[1]

This matter is now before the Court on Defendant Dr. Marcella Clark's supplemental motion for summary judgment arguing that examination of the medical records in evidence require dismissal of Plaintiff's claims of deliberate indifference to Plaintiff's serious medical needs.  For the reasons stated below, this Court GRANTS Defendant's motion and DISMISSES Plaintiff's complaint.

I.   **Factual Background**

On February 13, 2002, Plaintiff submitted a prison "kite" complaining of a "foot infection."  The kite was received by Nurse Richardson, RN, who placed Plaintiff on sick call.  (Def.'s Ex. A, p. 197.)

On February 14, 2002, around 9 a.m., Plaintiff was seen by mental health for on-going

---

[1]Paragraphs 39(d) and (e) of Plaintiff's complaint allege that:

39.   Defendant Dr. Clark was aware of Plaintiff's serious medical needs, but acted with deliberate indifference to Plaintiff's needs by, among other things:

* * *

    d.    refusing to follow the treatment regimen or to fill the prescriptions issued by Dr. Kahn after Plaintiff had received surgery and extensive treatment at Duane Waters Hospital;

    e.    refusing to fill the prescriptions that Plaintiff had received and [sic] being treated at Foote Hospital, and by refusing to provide Plaintiff with any pain medication after this visit; . . . .

(Pl.'s Compl. at ¶¶ 39(d) and (e); 11/22/04 R & R at 20-27.)

treatment for depression.[2]  At 10:20 a.m., Plaintiff's foot examined by the nursing staff for the first time.  Plaintiff informed the nursing staff that his right inside foot had been infected for two weeks.  The nurse observed signs of infection, and made an urgent referral of Plaintiff to Dr. Clark.  (Def.'s Ex. A, p. 209.)

On February 14, 2002, at around 10:30 a.m., Dr. Clark examined Plaintiff's foot for the first time.  Dr. Clark noted Plaintiff's subjective complaints and noted her objective observations that the medial aspect of Plaintiff's right ankle was swollen, with slight yellow discharge.  Dr. Clark diagnosed Plaintiff with "acute cellulitis" and prescribed Dicloxacillin (a penicillin antibiotic used to treat bacterial infections) for 14 days.  (Def.'s Ex. A, p. 197.)  Plaintiff's medical chart indicates that he received the prescription as ordered.  (Def.'s Ex. A, p. 183.)

On February 15, 2002, Plaintiff submitted a "kite" complaining of "severe foot pain." (Def.'s Ex. A, p. 198.)  The kite was reviewed by the nursing staff at 10:15 a.m.  At 10:20 a.m., the nursing staff charted the plan to administer Ibuprofen "1-2 every 6 hours prn [as needed for] pain" as well as antibiotics [Dicloxacillin] ordered by Dr. Clark on February 14, 2002.  There is no notation that Dr. Clark was notified of Plaintiff's complaint of pain. (Def.'s Ex. A, p. 208).

On February 18, 2002, Plaintiff submitted another kite complaining about his "infected wound."  The nursing staff reviewed the kite at Noon, and scheduled Plaintiff to be seen by Dr. Clark at sick call the following day.  (Def.'s Ex. A, p. 198.)  One hour later, at 1:00 p.m.,

---

[2]Plaintiff received mental health treatment for depression during the relevant time period, receiving a prescription for Sinequan (a tricyclic antidepressant used to treat depression).  (Def.'s Ex. A, pp. 238-39, 242.)

3

the nursing staff examined Plaintiff, noting that Plaintiff was complaining "that sore is hurting and foot and leg swollen." The nursing notes indicate that increased right foot cellulitis was observed even though Plaintiff had been receiving his prescribed antibiotics. The nursing staff consulted with the on-call physician who ordered Plaintiff to Duane Waters Hospital ER for evaluation by a physician. (Def.'s Ex. A, pp. 195, 198.)

On February 18, 2002, at 1:45 p.m., Plaintiff was treated in the Duane Waters Hospital ER by Dr. Kahn. Dr. Kahn observed an open wound on Plaintiff's right foot, draining yellow discharge. He diagnosed Plaintiff with "necrotic infected skin, with subcutaneous tissue" and ordered:

1.   Strict elevation;

2.   IV antibiotics (Zoysn and Levaquin each for 14 days) to be administered in the ER (noting that there were no beds in the hospital and thus Plaintiff was discharged back to prison with instructions to return to the hospital each day to receive his IV antibiotics);

3.   Silvadine with iodoform gauze dressing changes every day; and

4.   Evaluation by surgery for full debridement in the operating room.

(Def.'s Ex. A, p. 196.) A Dr. Trimble also prescribed Ultram (a pain medication stronger than Tylenol #3) for 7 days. (Def.'s Ex. A, p. 245.) Medication administration records indicate that Plaintiff received the Ultram pain medication each day as prescribed. (Def.'s Ex. A, pp. 245-46.)

On February 19, 2002, Plaintiff was examined by Dr. Clark. Dr. Clark noted that Plaintiff had been seen in the ER for cellulitis progressed to necrotic infected skin, that Plaintiff was given IV antibiotics, that the IV antibiotic treatment was to continue for 14 days, and that Plaintiff was to receive a surgery evaluation for possible debridement. Dr.

4

Clark observed that Plaintiff was ambulating slowing on a crutch, that his right foot was dressed, and had swelling and tenderness. Dr. Clark ordered that Plaintiff's necrotic subcutaneous skin infection be treated with continued IV antibiotics for 14 days, that Plaintiff keep his foot elevated, and that he "layin" until his prescribed medication is completed. (Def.'s Ex. A, p. 193.)

Plaintiff received his IV antibiotics and dressing changes at the ER as ordered by Dr. Kahn. (Def.'s Ex. A, pp. 183, 194, 244, 247.) Plaintiff's medical records indicate that Dr. Kahn ordered Plaintiff to discontinue taking Zosyn on February 25, 2002 (*id.* at p. 247); to discontinue taking Levaquin on February 28, 2002 (*id.* at 244); and on February 26, 2002, ordered that Plaintiff begin taking Rocephin (antibiotic) by IV in the ER for 10 days. Plaintiff's medication administration records indicate that these prescriptions were administered to Plaintiff and completed on March 7, 2002. (*Id.*, pp. 183, 243.)

On March 5, 2002, Plaintiff submitted a kite regarding "supplies for wounds." The nursing notes of D. Richardson, RN reflect that the nursing staff contacted Duane Waters Hospital and was informed that Plaintiff would receive details to finish his treatment. (*Id.* at 193.) This issue was not referred to Dr. Clark.

On March 8, 2002, Plaintiff was examined by nurse D. Richardson, RN and had his wound cleansed and dressings changed. (*Id.* at 190, 192.) This issue was not referred to Dr. Clark.

On March 18, 2002, Plaintiff submitted a kite for mineral oil. Nurse Richardson responded, referring the matter to Dr. Clark. (*Id.* at 192.)

On March 19, 2002, at 1:10 p.m., Dr. Clark examined Plaintiff and opined that there was "no indication for mineral oil at this time. Patient will get different management of right

5

foot (medial ankle) lesions." At 3:00 p.m. that same day, Dr. Clark's notes indicate that Plaintiff was seen earlier when present for dressing change, that the right ankle remains swollen and tender with an open ulcer (referencing attached photo), that patient still is requiring crutches for ambulation and is unable to bear weight, and that patient received IV antibiotics for 14 days and then oral antibiotics for an additional 14 days. Dr. Clark then prescribed the antibiotic Cipro for 10 days, requested an X-ray (to see if there was a need for a bone scan), and requested a surgery consult within two weeks (to see if there was a need for debridement). (*Id.* at 192.) Dr. Clark's request was faxed to CMS on March 21, 2002. On March 26, 2002, CMS approved the requested surgical consult with Dr. Wisneski to be held on April 2, 2002. (*Id.* at 192, 219, 220.)

On March 25, 2002, Plaintiff's ankle was X-rayed at Duane Waters Hospital at Dr. Clark's request. (*Id.* at 279.) In his March 26, 2002 report, the radiologist notes that marked swelling is observed, that osteomyelitis of the ankle should be ruled out, and a WBC bone scan is recommended for further follow-up. (*Id.*)

On March 29, 2002, at 8:00 a.m., Dr. Clark reviewed the March 25, 2002 X-ray and March 26, 2002 radiologist report, noted that the X-ray was suggestive of osteomyelitis, and noted that she would request a WBC bone scan be done at Foote Hospital. Dr. Clark's notes further indicate that Plaintiff has a surgical consult scheduled for the following week [April 2nd], that Plaintiff would be sent to Foote Hospital ER today, and Dr. Clark would have a discussion with the Foote ER to address the suspicion of osteomyelitis and pain medication. (*Id.* at 173.)

On March 29, 2002, Plaintiff's right ankle was x-rayed at Foote Hospital. The radiologist report states that the reason for the x-ray is to "rule out osteomyelitis," indicates

6

that three views of the ankle were taken, and finds that no osteomyelitis was seen at this time, that there is "no bone destruction or periosteal reaction, but a follow-up film or bone scan or an MRI scan could be obtained as clinically needed." (*Id.* at 225.) The findings further indicate that "[t]here is a 15 mm lucency in the superficial soft tissues below the medial malleolus. There is an ulceration in that location. Otherwise, there is normal anatomic alignment and mineralization with no fractures or dislocations. No erosions or soft tissue calcifications. There is minimal spurring of the plantar calcaneus." (*Id.*)

The March 29, 2002 Foote Hospital discharge notes indicate that Plaintiff was diagnosed as having a non-healing ulcer and was discharged with orders to elevate foot, to make twice daily Silvadine dressing changes on right ankle, to switch to Levaquin antibiotic, and to use Tylenol #3 as needed. (*Id.* at 174-180.)

On March 29, 2002, Dr. Clark notes at 2:30 p.m., that Plaintiff returned from Foote Hospital ER with a prescription for an antibiotic, Silvadine cream, and Tylenol #3. (*Id.* at 173.) Dr. Clark's notes further reveal that she spoke with Drs. Hutchinson and Ikram, that a surgery consult is scheduled for next week (with Dr. Wisneski), that she will schedule a WBC bone scan, and will order that Plaintiff complete his current antibiotic prescription. (*Id.*)

On March 29, 2002, Dr. Clark sent an urgent request to CMS for a WBC bone scan and bone biopsy consult within 1 week to rule out osteomyelitis. (*Id.* at 216.) Dr. Clark also ordered that Plaintiff elevate his leg and lay-in for two weeks. She also ordered Ultram -- a stronger pain medication than Tylenol #3 -- for Plaintiff. (*Id.* at 149-50.) Plaintiff's chart reveals that he received the prescribed Ultram, beginning April 2, 2002. (*Id.* at 150, 240.) There is no evidence that Plaintiff requested pain medication before this date.

On April 1, 2002, CMS approved Dr. Clark's request for a bone biopsy consult with Dr. Ikram, setting the appointment for April 10, 2002, but rejected Dr. Clark's request for a bone scan.  (*Id.* at 215.)

On April 2, 2002, Plaintiff received the scheduled surgical consultation with Dr. Wisneski at Foote Hospital.  Dr. Wisneski observed that the patient had not improved during the past 8 months despite antibiotic and local care treatment.  His notes indicate as follows: "will try in hospital care.  Dr. Kahn will admit.  Patient desires admission tomorrow.  Will comply."  (*Id.* at 172.)

Dr. Clark's notes reveal that she discussed Plaintiff's case with Dr. Wisneski on April 2, 2002, that hospitalization would be held off for now (although whirlpool therapy and foot elevation would be prescribed) in light of an appointment with orthopedic doctors scheduled for the next week for possible bone biopsy.  It was further noted that a bone scan was not approved by CMS.  (*Id.* at 172.)

On April 5, 2002, Plaintiff submitted another kite to the nursing staff concerning treatment for his foot.  (*Id.* at 172.)  This apparently was referred to a medical service provider.

On April 6, 2002, Plaintiff submitted another kite to the nursing staff concerning his foot treatment and antibiotics.  Nurse Richardson RN responded that Plaintiff was scheduled for an orthopedic consultation the next week [April 10th] and that Dr. Wisneski felt that antibiotics were ineffective.  (*Id.* at 172.)

On April 8, 2002, Plaintiff submitted another kite to the nursing staff for antibiotics.  Plaintiff's kite was referred to a medical service provider.  (*Id.* at 171.)

On April 9, 2002, Plaintiff submitted another kite to the nursing staff complaining about

8

treatment for his foot. The nursing staff responded, "per Dr. Clark, patient scheduled to see ortho[pedic consultation] soon on 4/10." (*Id.* at 45.)

On April 10, 2002, Plaintiff received his orthopedic consultation with Dr. Ikram as scheduled at Duane Waters Hospital. Dr. Ikram's notes state in pertinent part that:

> At this point, the patient notes an area approximately 2 cm. in width to the medial aspect of the ankle. There is good soft tissue coverage noted at this point. There is no marked erythema and no frank purulent drainage, however, there is some serosanguineous type drainage noted.
>
> Neurosentory/neuromotor examination is normal. Pulses are strong and bounding distally with good capillary refill noted. There are no open sores, lesions, abrasions or lacerations noted. There is no break in the skin noted.
>
> X-rays were obtained today and at this point, there appears to be no evidence of osteomyelitis nor are there any signs of sequestrum or any isolated changes to the bone.
>
> ASSESSMENT:
>
> Ulcer to the right ankle, medial aspect.
>
> PLAN:
>
> I reviewed the clinical examination along with the findings with the patient and recommend that we do wet to dry dressings. He may be a candidate for a cac to help with the healing of the ulcer. He would also be a candidate for possible oral antibiotics versus I.V. antibiotics. The patient was scheduled for admission to the hospital, but this was not done, and I would currently like to do that so he might get appropriate care for the ulcer at this point.
>
> The patient is currently being seen by Dr. Kahn who would manage the antibiotic treatment, and has also done this in the past, prior to being hospitalized.

(*Id.* at 255-56.)

On April 10, 2002, pursuant to Dr. Ikram's recommendations, Plaintiff was admitted to the hospital for treatment and discharged on April 18, 2002. (*Id.* at 282-85, 253-54.)

**II.   Standard for Summary Judgment**

9

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III.   Analysis

As stated above, this Court previously accepted the Magistrate Judge's Report and Recommendation and dismissed Plaintiff's claims against Dr. Clark in Paragraph 39(a), (b),

(c), and (f) asserting that:

> 39.   Defendant Dr. Clark was aware of Plaintiff's serious medical needs, but acted with deliberate indifference to Plaintiff's needs by, among other things:
>
> a. failing to take Plaintiff's condition seriously when she first observed Plaintiff's injury;
>
> b. prescribing antibiotics for Plaintiff's condition without conducting any examination of his injured right ankle;
>
> c. refusing to provide Plaintiff with pain medication despite Plaintiff's numerous requests and despite the obvious seriousness of Plaintiff's injuries, and despite the fact that Plaintiff told her that he was unable to purchase any pain relievers on his own;
>
> * * *
>
> f. by deliberately delaying the treatment regimen and medication prescribed by Dr. Wisneski after Plaintiff's visit to the Duane Waters Hospital Surgery Clinic, despite the fact that she knew Plaintiff was in severe pain from the Request for treatment that Plaintiff had sent on April 5, 2002.

(Pl.'s Compl. at ¶¶ 39(a), (b), (c), and (f); 11/22/04 R & R at 20-27.)

Plaintiff's sole remaining claims against Dr. Clark are the following:

> 39.   Defendant Dr. Clark was aware of Plaintiff's serious medical needs, but acted with deliberate indifference to Plaintiff's needs by, among other things:
>
> * * *
>
> d. refusing to follow the treatment regimen or to fill the prescriptions issued by Dr. Kahn after Plaintiff had received surgery and extensive treatment at Duane Waters Hospital;
>
> e. refusing to fill the prescriptions that Plaintiff had received and [sic] being treated at Foote Hospital, and by refusing to provide Plaintiff with any pain medication after this visit; . . . .

(Pl.'s Compl. at ¶¶ 39(d) and (e); 11/22/04 R & R at 20-27.)

The time period at issue in Paragraphs 39(d) and (e) of Plaintiff's complaint concern

11

the time period of February through April 2, 2002. The claims concerning events after Plaintiff's April 2, 2002 treatment at Duane Waters Hospital have already been dismissed (claims in ¶ 39(f)).

### A. Deliberate Indifference to Serious Medical Needs

To succeed on his claim of inadequate medical care in violation of the Eighth Amendment, Plaintiff must establish that Dr. Clark acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Accord Farmer*, 511 U.S. at 835-36.

A prisoner's Eighth Amendment claim of deliberate indifference to serious medical needs has both an objective and a subjective component. *Farmer*, 511 U.S. at 834. "The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

As the Sixth Circuit recently affirmed, "'Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Jennings v. Al-Dabagh, M.D.*, No. 03-2046, 2004 WL 957817, *1 (6th Cir. April 29, 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "In order to show a constitutional violation based on an alleged delay in treatment, the prisoner must

12

place verifying medical evidence in the record establishing the detrimental effect of the delay." *Id.* (citing *Napier v. Madison County, Ky.,* 238 F.3d 739, 742 (6th Cir. 2001)).

### B. Proof of Subjective Component of Deliberate Indifference Test

The objective component of Plaintiff's claim is not at issue here. (*See* R&R at 8-9.) Rather, Dr. Clark's supplemental motion argues that Plaintiff cannot show that a genuine issue of material fact exists as to the subjective component of Plaintiff's Eighth Amendment claim of deliberate indifference to his serious medical needs. Dr. Clark is correct.

Plaintiff's Eighth Amendment complaints in ¶¶ 39(d) and (e) assert that Dr. Clark was deliberately indifferent to his serious medical needs because she (1) failed to take his condition serious enough when she first observed his foot; (2) prescribed an antibiotic without conducting any examination of his foot; (3) refused to provide pain medication despite Plaintiff's numerous requests and despite the obvious seriousness of his condition; (4) refused to follow the treatment regimen or fill the prescriptions issued by Plaintiff's treating physician at Duane Waters Hospital in February 2002; (5) refused to fill prescriptions Plaintiff received from his treating physician at Foote Hospital on March 29, 2002; and (6) deliberately delayed treatment of his medical condition. (Pl.'s Aff. at ¶ 22.)

First, Plaintiff's personal opinion that Dr. Clark did not take his medical condition serious enough and that Dr. Clark failed to provide adequate treatment "raises claims of state-law medical malpractice, not constitutionally defective medical care indifferent to [the plaintiff]'s serious medical needs." *Jennings,* 2004 WL 957187, *2 (citing *Westlake*, 537 F.2d at 860-61).

Second, despite Plaintiff's claims to the contrary, there is no evidence showing that Dr. Clark was informed of Plaintiff's need for pain medication and refused to provide such

13

medication. In fact, the evidence is to the contrary.

On February 15, 2002, Plaintiff submitted a "kite" complaining of "severe foot pain." (Def.'s Ex. A, p. 198.) The kite was reviewed by the nursing staff at 10:15 a.m. At 10:20 a.m., the nursing staff charted the plan to administer Ibuprofen "1-2 every 6 hours prn [as needed for] pain" as well as antibiotics [Dicloxacillin] ordered by Dr. Clark on February 14, 2002. There is no notation that Dr. Clark was notified of Plaintiff's complaint of pain. (Def.'s Ex. A, p. 208).

On February 18, 2002, after treatment at the Duane Waters Hospital ER, Plaintiff received a prescription for Ultram (a pain medication stronger than Tylenol #3) for 7 days from a Dr. Trimble. (Def.'s Ex. A, p. 245.) Medication administration records indicate that Plaintiff received this medication. (Def.'s Ex. A, pp. 245-56.)

On March 29, 2002, after treatment at Foote Hospital, Plaintiff received a prescription to use Tylenol #3 as needed. (*Id.* at 173-80.) Dr. Clark changed the Tylenol #3 prescription to Ultram, a stronger pain reliever than Tylenol #3. (Def.'s Ex. A, p. 149-50.) Plaintiff's chart reveals that he received the prescribed Ultram, beginning on April 2, 2002. (*Id.* at 150, 240.) There is no notation that Dr. Clark or the nursing staff was notified of any complaint of pain by Plaintiff prior to his receipt of the Ultram pain medication.

Third, despite Plaintiff's claims to the contrary, there is no evidence showing that Dr. Clark was informed of Plaintiff's need for medical treatment and refused to provide such treatment. Again, the evidence is to the contrary.

On February 18, 2002, Plaintiff submitted a kite complaining about his "infected wound." The nursing staff reviewed the kite at Noon, and scheduled Plaintiff to be seen by Dr. Clark at sick call the following day. (Def.'s Ex. A, p. 198.) One hour later, however, the

14

nursing staff examined Plaintiff, noting that Plaintiff was complaining "that sore is hurting and foot and leg swollen." The nursing staff consulted with the on-call physician who ordered Plaintiff to Duane Waters Hospital ER for evaluation by a physician. (Def.'s Ex. A, pp. 195, 198.)

On February 18, 2002, at 1:45 p.m., Plaintiff was treated in the Duane Waters Hospital ER by Dr. Kahn. Dr. Kahn observed an open wound on Plaintiff's right foot, draining yellow discharge. He diagnosed Plaintiff with "necrotic infected skin, with subcutaneous tissue" and ordered: (1) strict elevation; (2) IV antibiotics (Zoysn and Levaquin each for 14 days) to be administered in the ER (noting that there were no beds in the hospital and thus Plaintiff was discharged back to prison with instructions to return to the hospital each day to receive his IV antibiotics); (3) Silvadine with iodoform gauze dressing changes every day; and (4) Evaluation by surgery for full debridement in the operating room. (Def.'s Ex. A, p. 196.)

On February 19, 2002, Plaintiff was examined by Dr. Clark. Dr. Clark noted that Plaintiff had been seen in the ER for cellulitis progressed to necrotic infected skin, that Plaintiff was given IV antibiotics, that the IV antibiotic treatment was to continue for 14 days, and that Plaintiff was to receive a surgery evaluation for possible debridement. Dr. Clark observed that Plaintiff was ambulating slowing on a crutch, that his right foot was dressed, and had swelling and tenderness. Dr. Clark ordered that Plaintiff's necrotic subcutaneous skin infection be treated with continued IV antibiotics for 14 days, that Plaintiff keep his foot elevated, and that he "lay-in" until his prescribed medication is completed. (Def.'s Ex. A, p. 193.)

Plaintiff received his IV antibiotics and dressing changes at the ER as ordered by Dr. Kahn. (Def.'s Ex. A, pp. 183, 194, 244, 247.) Plaintiff's medical records indicate that Dr.

Kahn ordered Plaintiff to discontinue taking Zosyn on February 25, 2002 (*id.* at p. 247); to discontinue taking Levaquin on February 28, 2002 (*id.* at 244); and on February 26, 2002, ordered that Plaintiff begin taking Rocephin (antibiotic) by IV in the ER for 10 days. Plaintiff's medication administration records indicate that these prescriptions were administered to Plaintiff and completed on March 7, 2002. (*Id.*, pp. 183, 243.)

On March 5, 2002, Plaintiff submitted a kite regarding "supplies for wounds." The nursing notes of D. Richardson, RN reflect that the nursing staff contacted Duane Waters Hospital and was informed that Plaintiff would receive details to finish his treatment. (*Id.* at 193.)   This issue was not referred to Dr. Clark.

On March 8, 2002, Plaintiff was examined by nurse D. Richardson, RN and had his wound cleansed and dressings changed. (*Id.* at 190, 192.)  This issue was not referred to Dr. Clark.

On March 18, 2002, Plaintiff submitted a kite for mineral oil.  Nurse Richardson responded, referring the matter to Dr. Clark. (*Id.* at 192.)

On March 19, 2002, at 1:10 p.m., Dr. Clark examined Plaintiff and opined that there was "no indication for mineral oil at this time.  Patient will get different management of right foot (medial ankle) lesions."  At 3:00 p.m. that same day, Dr. Clark's notes indicate that Plaintiff was seen earlier when present for dressing change, that the right ankle remains swollen and tender with an open ulcer (referencing attached photo), that patient still is requiring crutches for ambulation and is unable to bear weight, and that patient received IV antibiotics for 14 days and then oral antibiotics for an additional 14 days.  Dr. Clark then prescribed the antibiotic Cipro for 10 days, requested an X-ray (to see if there was a need for a bone scan), and requested a surgery consult within two weeks (to see if there was a

16

need for debridement). (*Id.* at 192.) Dr. Clark's request was faxed to CMS on March 21, 2002. On March 26, 2002, CMS approved the requested surgical consult with Dr. Wisneski to be held on April 2, 2002. (*Id.* at 192, 219, 220.)

On March 25, 2002, Plaintiff's ankle was X-rayed at Duane Waters Hospital at Dr. Clark's request. (*Id.* at 279.) In his March 26, 2002 report, the radiologist notes that marked swelling is observed, that osteomyelitis of the ankle should be ruled out, and a WBC bone scan is recommended for further follow-up. (*Id.*)

On March 29, 2002, at 8:00 a.m., Dr. Clark reviewed the March 25, 2002 X-ray and March 26, 2002 radiologist report, noted that the X-ray was suggestive of osteomyelitis, and noted that she would request a WBC bone scan be done at Foote Hospital. Dr. Clark's notes further indicate that Plaintiff has a surgical consult scheduled for the following week [April 2nd], that Plaintiff would be sent to Foote Hospital ER today, and Dr. Clark would have a discussion with the Foote ER to address the suspicion of osteomyelitis and pain medication. (*Id.* at 173.)

On March 29, 2002, Plaintiff's right ankle was x-rayed at Foote Hospital. The radiologist report states that the reason for the x-ray is to "rule out osteomyelitis," indicates that three views of the ankle were taken, and finds that no osteomyelitis was seen at this time, that there is "no bone destruction or periosteal reaction, but a follow-up film or bone scan or an MRI scan could be obtained as clinically needed." (*Id.* at 225.) The findings further indicate that "[t]here is a 15 mm lucency in the superficial soft tissues below the medial malleolus. There is an ulceration in that location. Otherwise, there is normal anatomic alignment and mineralization with no fractures or dislocations. No erosions or soft tissue calcifications. There is minimal spurring of the plantar calcaneus." (*Id.*)

The March 29, 2002 Foote Hospital discharge notes indicate that Plaintiff was diagnosed as having a non-healing ulcer and was discharged with orders to elevate foot, to make twice daily Silvadine dressing changes on right ankle, to switch to Levaquin antibiotic, and to use Tylenol #3 as needed. (*Id.* at 174-180.)

On March 29, 2002, at 2:30 p.m., Dr. Clark notes that Plaintiff returned from Foote Hospital ER with a prescription for an antibiotic, Silvadine cream, and Tylenol #3. (*Id.* at 173.) Dr. Clark's notes further reveal that she spoke with Drs. Hutchinson and Ikram, that a surgery consult is scheduled for next week (with Dr. Wisneski), that she will schedule a WBC bone scan, and will order that Plaintiff complete his current antibiotic prescription. (*Id.*)

On March 29, 2002, Dr. Clark sent an urgent request to CMS for a WBC bone scan and bone biopsy consult within 1 week to rule out osteomyelitis. (*Id.* at 216.) Dr. Clark also ordered that Plaintiff elevate his leg and lay-in for two weeks. She also ordered Ultram – a stronger pain medication than Tylenol #3 -- for Plaintiff. (*Id.* at 149-50.)

On April 1, 2002, CMS approved Dr. Clark's request for a bone biopsy consult with Dr. Ikram, setting the appointment for April 10, 2002, but rejected Dr. Clark's request for a bone scan. (*Id.* at 215.)

On April 2, 2002, Plaintiff received the scheduled surgical consultation with Dr. Wisneski at Foote Hospital. Dr. Wisneski observed that the patient had not improved during the past 8 months despite antibiotic and local care treatment. His notes indicate as follows: "will try in hospital care. Dr. Kahn will admit. Patient desires admission tomorrow. Will comply." (*Id.* at 172.)

Dr. Clark's notes reveal that she discussed Plaintiff's case with Dr. Wisneski on April

18

2, 2002, that hospitalization would be held off for now (although whirlpool therapy and foot elevation would be prescribed) in light of an appointment with orthopedic doctors scheduled for the next week for possible bone biopsy. It was further noted that a bone scan was not approved by CMS. (*Id.* at 172.)

Viewing the evidence in the light most favorable to Plaintiff, there is nothing in the record to show that Dr. Clark was subjectively aware of Plaintiff's serious medical need for either medication of treatment and that she deliberately ignored or delayed providing any such medication or treatment. Accordingly, Plaintiff's remaining Eighth Amendment claims against Dr. Clark are dismissed.

## III. Conclusion

For the above-stated reasons, Defendant Dr. Clark's supplemental motion for summary judgment is GRANTED, and Plaintiff's claims are DISMISSED.


                                        <u>s/NANCY G. EDMUNDS</u>
                                        Nancy G. Edmunds
                                        U.S. District Judge

Dated: April 18, 2005